371 So.2d 503 (1979)
The FLORIDA CANNERS ASSOCIATION, a Florida Corporation, et al., Petitioners,
v.
State of Florida, DEPARTMENT OF CITRUS, Respondent.
No. 77-1921.
District Court of Appeal of Florida, Second District.
May 16, 1979.
*506 E. Snow Martin of Martin & Martin, Lakeland, and Roderick K. Shaw, Jr. and Edward O. Savitz of Allen, Dell, Frank & Trinkle, Tampa, for petitioners.
Monterey Campbell of Campbell, Dunlap, Coward & Blakeman, Bartow, for respondent.
DANAHY, Judge.
This is a petition to review the final agency action of Respondent in adopting Florida Administrative Code Rule 20-66.04, which reads as follows:
20-66.04 Florida Identification:
Effective January 1, 1979, all processed 100% grapefruit products packed in retail containers in Florida shall be prominently identified by use of the word "Florida" or the Florida Sunshine Tree registered certification mark (U.S.Reg. No. 941,773) as described in, and authorized by, Department of Citrus Rule 20-94, including the surrounding phrase "A Product of the Florida Sunshine Tree." To be prominent when placed on the label, the word "Florida" or the certification mark shall be clearly legible, appear at least one time in a conspicuous location and be in a size and contrasting color so as to be readily seen under general conditions of purchase. To be prominent, when printed or embossed on the container end, the word "Florida" or the certification mark shall be clearly legible, be in a conspicuous size and, if printed, be in a contrasting color, so as to be readily seen under general conditions of purchase.
Pursuant to a joint stipulation and motion, this court has entered an order staying the effectiveness of Rule 20-66.04 pending disposition of this case in this court.
Petitioner Florida Canners Association is a nonprofit trade association whose members include substantially all processors who pack processed grapefruit products in Florida. Each of the other petitioners is a member of Florida Canners Association and each packs substantial quantities of processed grapefruit products in retail containers in Florida. Each markets its own production of processed citrus products. A number of the petitioners advertise and promote brands owned by them or their customers.
A container of processed grapefruit products packed in Florida may hold products derived solely from grapefruit grown in Florida or it may contain a blend of products from grapefruit grown in Florida and grapefruit grown out of the state.
Petitioners have launched a multipronged attack on Rule 20-66.04, asserting first that Respondent lacks statutory authority to promulgate such a rule, and alternatively that the rule violates provisions of the federal and Florida constitutions. Initially, Petitioners' challenge was directed in large part to the fact that the rule on its face appears to apply not only to grapefruit products derived entirely from grapefruit grown in Florida, but to grapefruit products derived wholly or partly from grapefruit grown outside the state. Since it is unlawful in this state to place a designation of Florida origin on citrus fruit products if any part thereof come from outside the state,[1] the effect of the facial application of the rule to out-of-state grapefruit is readily apparent.
However, Respondent has made a statement to this court concerning the application of the rule which we consider binding; that the rule applies only to processed 100% grapefruit products packed in retail containers in Florida which are derived entirely from grapefruit grown in Florida. We have proceeded to assess the validity of the rule on that basis.
Petitioners argue that, notwithstanding the restricted application of the rule, the rule cannot withstand their challenge on statutory and constitutional grounds. That challenge and Respondent's defense require a modern-day examination of a 44 year old legislative directive that Respondent advertise Florida citrus fruit. Respondent recognizes that its authority to promulgate the *507 rule in question is not expressly conferred by any applicable statute, but it asserts that such authority is derived from its express duty to advertise and promote the sale of Florida citrus fruit.[2]
Respondent's concern is that the supply of Florida grapefruit is expected to increase twice as fast as demand. An increase in the consumption of grapefruit products must, therefore, be an overall goal of Respondent's grapefruit advertising efforts. Petitioners agree that there will be an oversupply of grapefruit, and state that "[t]he desire for substantial increase in sales demand is a common goal that is strongly held by Petitioners and Respondent alike."
Respondent, however, has a further concern; it points to the fact that one-half of the anticipated significant increase in the growth of grapefruit by the 1979-80 season will be in citrus-producing areas other than Florida, so that there will be an ever-increasing competitiveness from these non-Florida areas in the marketplace. Respondent says, in effect, that there is no way it can carry out the duties placed upon it by the legislature to advertise Florida citrus unless Florida citrus is identified to the consumer; that when Florida grapefruit is advertised but the product in the marketplace is not identified, Respondent is not advertising Florida grapefruit, but grapefruit from California, Arizona, Texas, Brazil and other citrus-producing areas that compete with Florida in the marketplace. Therefore, according to Respondent, the rule in question is necessary and proper for the performance of Respondent's duty to advertise Florida citrus, which is the pursuit of a legitimate legislative objective.
Petitioners argue that authority to compel a designation of Florida origin on Florida grapefruit products packed by them is not implied by Respondent's duty to conduct advertising; but if that power is so implied, the legislature has unlawfully delegated legislative power to Respondent. Furthermore, say Petitioners, the rule violates the commerce clause of the United States Constitution and the guarantees of due process of law and freedom of speech contained in both the United States and Florida Constitutions. In presenting these challenges, Petitioners do not make an issue of the rule's definition of "prominent," nor do they complain of the cost to them of complying with the rule.
For the reasons hereinafter expressed, we reject Petitioners' arguments and hold that Respondent's Rule 20-66.04 is valid.

STATUTORY AUTHORITY
The statutory scheme for regulation of the Florida citrus industry was first established by the legislature in 1935 and has remained basically unchanged since then. In that year several legislative acts were passed which were designed to regulate the production and marketing of citrus fruit. Chapters 16854 through 16862, Laws of Florida (1935). The first of these, Chapter 16854, established Respondent under the name "Florida Citrus Commission" and made it a corporate body. Respondent was charged with the duty of carrying out all the provisions and requirements of Chapter 16854. To defray its expenses, an excise tax was levied and made payable to Respondent by persons selling or offering citrus fruit for sale or shipment in Florida.
Basically, Chapter 16854 called for the inspection and grading of citrus fruit, and Respondent was given extensive specific power and authority to accomplish the purpose of the act. Additionally, Respondent was empowered to "adopt and from time to time alter, rescind, modify and/or amend all proper and necessary rules, regulations and orders for the exercise of its powers and the performance of its duties under this act and to act as the general supervisory authority over the administration and enforcement of this act and the provisions thereof and to exercise such other powers and perform such other duties as may be imposed upon it by other laws of the State of Florida."
*508 Among the reasons for the passage of Chapter 16854, as expressed in the act, were the following:
In the exercise of the police power of the state to protect the public health and welfare and to stabilize and protect the citrus industry of the State of Florida. Because the citrus fruit crop grown in Florida comprises the major agricultural crop of Florida and the business of disposing of such crop is of public interest. Because it is wise, necessary and expedient to protect and enhance the quality and reputation of Florida citrus fruit in domestic and foreign markets.
.....
Because said act is designed to promote the general welfare of the Florida citrus fruit industry, which in turn will promote the general welfare of the State of Florida.
Chapters 16856 through 16858, Laws of Florida (1935) established the "orange advertising fund," the "grapefruit advertising fund" and the "tangerine advertising fund," respectively. Each act imposed an excise tax payable to Respondent by the person first handling the particular citrus fruit in the primary channel of trade. The only difference in these laws was in the amount of the respective taxes.
Chapter 16857, establishing the grapefruit advertising fund, stated that its purpose was to promote the sale of grapefruit produced in Florida through the conducting of an advertising campaign. The reasons for the passage of the act were stated to be that economic waste was being fostered in the citrus industry of the state by the lack of proper advertising and dissemination of information necessary for the development and promotion of the sale of grapefruit grown in Florida; that this created an adverse economic impact on all citizens of the state; that in the interest of the public welfare and general prosperity of the state, such deplorable and unnecessary loss could and should be eliminated by acquainting the general public with the health-giving qualities and the food and/or dietetic value of the different grades of grapefruit grown in Florida. The act expressly stated that it was designed "to promote the general welfare of the Florida citrus fruit industry, which in turn will promote the general welfare of the State of Florida."
Chapter 16857 charged Respondent with the duty to plan and conduct a campaign for commodity advertising, publicity, and sales promotion to increase the consumption of grapefruit. As defined in the act, the word "grapefruit" meant grapefruit grown in the State of Florida. Respondent was also given the duty to decide upon some distinctive and suggestive tradename and to promote its use in all ways to advertise Florida citrus fruit.
After imposing an excise tax to fund the grapefruit advertising fund, the act provided that all monies collected by Respondent under the act over and above necessary administrative expenses "shall be spent exclusively for the advertising of [Florida] grapefruit as herein provided." Respondent was empowered to adopt and from time to time alter, rescind, modify and/or amend all proper and necessary rules, regulations and orders for the exercise of its powers and the performance of its duties under the act. Finally, the act provided that it was to be liberally construed. In 1937, the legislature replaced the 1935 act with Chapter 17780, Laws of Florida (1937), which added provisions not pertinent here.
In 1941 the Florida legislature adopted and enacted a compilation and revision of the laws of general application of Florida, designated as Florida Statutes (1941). The three laws establishing the orange advertising fund, the grapefruit advertising fund, and the tangerine advertising fund, were consolidated by the revisors and placed in Chapter 599, Florida Statutes (1941), entitled "Citrus Advertising." Other citrus laws were set forth in separate chapters. Section 599.02, headed "Necessity for Citrus Advertising" stated the following:
When proper advertising and dissemination of information necessary for the development and promotion of the sale of citrus fruits grown in this state is not *509 made, economic waste is fostered in the citrus industry and chaotic conditions are created, in said industry, that imperil the ability of producers to contribute in appropriate amounts to the support of ordinary governmental and educational functions of the state, thus tending to increase the tax burdens of other citizens for the same purposes. Such unavoidable and unnecessary loss may be eliminated by acquainting the general public with the health-giving qualities and the food and dietetic values of the different kinds and grades of citrus fruit grown in this state, and in the interest of the public welfare and general prosperity of the state should be. (emphasis added).
Again it was provided that monies going into the grapefruit advertising fund, after payment of expenses, were to be used exclusively for the advertising of Florida grapefruit.
In 1949 all of Florida's citrus laws were consolidated and enacted as the "Florida Citrus Code of 1949" (the Code), which, as subsequently amended, is set forth in Chapter 601, Florida Statutes (1977) and Florida Statutes (Supp. 1978). In 1969 Respondent was renamed the State of Florida Department of Citrus and the Florida Citrus Commission was made its head, Respondent occupies a unique position in Florida government in that it receives no funds from the general revenue of the state, but operates solely and exclusively from excise taxes which are collected by Respondent from handlers of citrus fruit in Florida.[3]
Section 601.02 expresses the fact that the Code was enacted in the exercise of the police power of the state. This section further states that the planting, growing, cultivating, etc. of the Florida citrus crop and the harvesting, processing, etc. of that crop, together with the sale and distribution of that crop, affect the health, morals, and general economy of a vast number of citizens of the state who are either directly or indirectly dependent thereon for a livelihood, and said business is, therefore, of vast public interest.
In Section 601.15, the Code retains the original 1935 directive that Respondent plan and conduct a campaign for commodity advertising, publicity, and sales promotion to increase the consumption of citrus fruit and to decide upon some distinctive and suggestive tradename and promote its use in all ways to advertise Florida citrus fruit. Excise taxes are imposed to provide moneys for the Florida Citrus Advertising Trust Fund, which is appropriated by the statute to Respondent's use.[4] Portions of that fund are devoted to citrus research, transportation studies, a reserve fund for advertising of oranges, and payment of administration expenses. The balance must be used exclusively for the advertisement of citrus fruits, either in fresh or processed form, produced in the state.[5]
Section 601.10 expresses the powers of Respondent, the first of which is "to adopt and, from time to time, alter, rescind, modify, or amend all proper and necessary rules, regulations, and orders for the exercise of its powers in the performance of its duties under this chapter and other statutes of the state." That power is repeated in Section 601.15(10)(a), pertaining to Respondent's advertising campaign.
The question whether Respondent has statutory authority to adopt Rule 20-66.04 boils down to the question whether that *510 rule is "proper and necessary" for the performance of Respondent's duty to advertise Florida citrus fruit. We believe it is. We accept Respondent's conclusion that, whereas identification of Florida origin might not have been deemed necessary in previous years, it is now made necessary by the anticipated increased competition from non-Florida grapefruit-producing areas. We agree that the rule is an appropriate means of achieving that identification in the marketplace. It is significant, we think, that the legislature's directive to advertise, from the time it was originally issued in 1935 to date, has been to advertise not just grapefruit, but Florida grapefruit. Taking into consideration the extensive regulatory powers of Respondent with respect to the citrus industry and the importance of that industry to the State of Florida, we believe the legislature has given Respondent the implied power to require Florida identification of Florida grapefruit products.
In their argument to the contrary, Petitioners point to Section 601.11 of the Code, which specifically mentions the power of Respondent to prescribe rules and regulations governing the marking, branding, labeling, tagging or stamping of citrus fruit or products thereof for the purpose of showing the name and address of the person marketing such citrus fruit or products thereof and the grade, quality, variety, type, or size of the citrus fruit, or the grade, quality, variety, type, and amount of the products. Petitioners argue that Section 601.11 shows a clear legislative intent to limit Respondent's authority over labeling to the matters expressly stated in that section.
We do not agree. Section 601.11 gives Respondent broad power to establish state grades and minimum maturity and quality for citrus fruits and products thereof. The specific mention of the power to prescribe rules or regulations for the marking, branding, labeling, etc. of citrus fruit or products thereof to reflect grade and quality does not, in our view, clearly indicate a legislative intent that Respondent can enact requirements as to marking and labeling only in that particular area. On the contrary, we believe Section 601.11 shows that the legislature considered jurisdiction of Respondent over marking and labeling to be appropriate when necessary to carry out a legislative purpose.
Petitioners argue also that Florida legislative history demonstrates that the legislature has expressly rejected compulsory declaration of Florida origin on Florida citrus and citrus products. In 1937 the legislature enacted, and in 1939 the legislature repealed, a law compelling declaration of Florida origin on any container of canned citrus fruit or citrus juice produced or grown in the State of Florida and prohibiting the use of any container bearing the word "Florida" for citrus fruit or citrus juice produced or grown outside the state. The 1937 law, Chapter 17783, Laws of Florida (1937), stated in a preamble the evil perceived by the legislature to which the law was directed. This was that certain persons in the state had theretofore engaged in the practice of importing into the state citrus fruit and citrus juice produced and canned in other states and countries and labeling the same in the State of Florida and selling the same in and from the State of Florida, thereby leading the dealers in such canned citrus fruit and citrus juice to believe that such citrus fruit and citrus juice was produced in the State of Florida, to the injury and detriment of producers and canners of citrus fruits and citrus juice in the state.
In 1939 the legislature abandoned the approach of the 1937 law by repealing it and replacing it with a simply prohibition against shipping citrus fruit or citrus juice from the State of Florida which is grown in any other state in such manner as to indicate in any form whatsoever that such citrus fruit or citrus juice was produced and canned in the State of Florida. That law is reflected today in Section 601.98 of the Florida Citrus Code.
In 1939, also, the legislature ventured into the area of establishing a tradename by enacting Chapter 19477, which set forth specific standards for citrus fruit and citrus *511 fruit products and the containers thereof, and then provided that any person who canned Florida-grown citrus products packed to standard as set forth in the act was permitted to stamp or emboss on the top or bottom of the container the word "Floridabest" or show the word "Floridabest" on the label. The method and manner of marking labels and stamping or embossing containers, including the size and type of lettering, was to be provided in rules promulgated by Respondent. Chapter 19477, Florida Statutes (1939). This act also repealed Chapter 17783, Laws of Florida (1937) "and any or all other laws in conflict herewith."
As shown above, and as pointed out by Petitioners, all of the basic provisions of today's Florida Citrus Code were in existence in 1937. Therefore, Petitioners argue, if the legislature considered the existing laws to authorize Respondent to compel the use of Florida identification on product containers, there would have been no need to enact Chapter 17783 in 1937.
Respondent replies that in enacting Chapter 17783, the legislature was not speaking to the area of advertising, but to the misleading practice of importing non-Florida citrus into the state and then shipping it out in such a form, including labeling, as to indicate that it was Florida citrus or citrus products. Respondent argues that the legislature had in mind a specific matter of great importance and simply stepped into the area of citrus regulation by the exercise of a power held by the legislature concurrently with Respondent.
Respondent further argues that it is reasonable to assume that the legislature may have deemed it unwise to require designation of origin across the board on all citrus fruit or citrus products shipped out of the state. It cannot be concluded, says Respondent, that the actions of the legislature in 1937 and 1939 with regard to designation of Florida origin meant, first, that only the legislature had the power to require such designation, or, second, that the legislature expressly found it unwise ever to require such designation. We agree with Respondent that the legislature intended simply to leave the matter in Respondent's hands.
The legislative effort begun in 1939 to promote the use of the word "Floridabest" was abandoned in 1949 when the Florida Citrus Code was enacted. The Code simply retains the provision, originally enacted in 1935, that Respondent is to decide upon some distinctive and suggestive tradename and to promote its use in all ways to advertise Florida citrus fruit. Again, we believe that the legislature simply stepped into a field already occupied by Respondent and then stepped out, leaving the matter again in the hands of Respondent.

INVALID DELEGATION OF LEGISLATIVE POWER
The fundamental principle that legislative power may not be delegated to an administrative agency is more firmly embedded in Florida law than in the law of some other jurisdictions. Askew v. Cross Key Waterways, 372 So.2d 913 (Fla. 1978). The present Florida constitution, as did its predecessors, specifically provides that no person belonging to one branch of state government shall exercise any powers appertaining to either of the other branches unless expressly provided in the constitution. Article II, Section 3, Florida Constitution. The legislative power of the state is vested in the legislature of the State of Florida. Article III, Section 1, Florida Constitution.
Petitioners state the rule to be that when the legislature delegates powers to an administrative agency, it must announce adequate standards to guide the agency in the execution of the powers delegated. Petitioners argue that, assuming the legislature impliedly granted to Respondent the power to require designation of Florida origin with respect to Florida citrus and citrus products, that grant is an unlawful delegation of legislative power because there are no guidelines set forth in the Florida Citrus Code to prevent the entrusting of that responsibility from becoming an abdication of the legislature's lawmaking responsibility.
*512 Petitioners parade a list of horribles which might result from what Petitioners contend is the unrestrained implied power of Respondent in this area. Petitioners suggest that there is nothing to prevent Respondent from deciding in the future to compel the use of a single Respondent-dictated industry-wide tradename as the required form of identification on all processed grapefruit products, or a Respondent-dictated identification to be of equal or greater prominence than Petitioners' own private brand names, or a direction by Respondent compelling Petitioners to abandon the use of their own private brand names and rely exclusively on a Respondent-dictated form of identification for Petitioners' grapefruit products.
In support of their position, Petitioners have cited to us several recent decisions of our supreme court finding an unlawful delegation of legislative power because of the absence of adequate guidelines. E.g., Askew v. Cross Key Waterways, supra; Harrington & Co., Inc. v. Tampa Port Auth., 358 So.2d 168 (Fla. 1978). But the cases cited by Petitioners deal with discretionary powers given to administrative agencies to issue licenses, permits, approvals, or designations. That is not the situation here.
The Florida Supreme Court early recognized the constitutionality of statutory provisions authorizing administrative agencies to formulate rules and regulations to make a statute effective for the public purpose designed. State v. Atlantic Coastline R. Co., 56 Fla. 617, 47 So. 969 (1908). In a later case, the supreme court held that in order to justify the courts in declaring invalid as a delegation of legislative power a statute conferring particular duties or authority upon administrative officers, it must clearly appear beyond a reasonable doubt that the duty or authority so conferred is a power that appertains exclusively to a legislative department, and the conferring of it is not warranted by the provisions of the constitution. Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789 (1919). In that case the court stated:
The legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law; but it may enact a law complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose. This principle of the law is peculiarly applicable to regulations under the police power, since the complex and ever-changing conditions that attend and affect such matters make it impracticable for the legislature to prescribe all necessary rules and regulations.
Authority to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation and enforcement of a law within designated limitations, is not an exclusively legislative power. Such authority is administrative in its nature, and its use by administrative officers is essential to the complete exercise of the powers of all the departments.
The exercise of some authority, discretion, or judgment may be incident or necessary to the performance of administrative or ministerial duties; but such authority, discretion, or judgment is subject to judicial review; and it is not among the powers of government that the constitution separates into departments.
Id. at 793.
Thus the mere granting of authority to Respondent to make rules and regulations does not alone constitute an unlawful delegation of legislative power. The limitations mentioned by the court in Bailey v. Van Pelt, supra, can be found in the requirement that Respondent's rules and regulations be proper and necessary to the exercise of Respondent's powers and the performance of Respondent's duties for the accomplishment of a clearly stated legislative objective. And finally, any rule or regulation enacted by Respondent is subject to judicial review.
*513 In Arnold v. State, 140 Fla. 610, 190 So. 543 (1939), the Florida Supreme Court considered a law which provided for the establishment and support of a system of public free schools in Florida, and gave the State Board of Education authority to promulgate rules and regulations to effect such a system. In rejecting a challenge to one such rule, the court said that it and other rules promulgated under the act, so long as they were shown to conform to the general purpose of the act, would not be held to be in violation of the separation of power provisions of the constitution. The court said that the test of validity in a case of this kind is whether or not the act defines a pattern by which the rule or regulation must be made to conform. The court held that since the rule in question went to the establishment and support of the public free school system, it was within the purview of the act.
The expressed legislative intent of the Florida Citrus Code with respect to advertising is that Florida citrus fruit be advertised, that Respondent plan and promote an advertising campaign for that purpose, and that Respondent enact any rule proper and necessary to the performance of that duty. This legislative framework provides an adequate basis for determining whether, in promulgating a rule requiring a form of designation on Florida citrus products, Respondent is carrying out the intent of the legislature. We conclude that the legislature has not unconstitutionally delegated legislative power to Respondent by empowering Respondent to adopt such a rule.

DUE PROCESS OF LAW
Both the 14th Amendment to the United States Constitution and Article I, Section 9, of the Florida Constitution prohibit the taking of property without due process of law. We consider the federal and Florida constitutional guarantees as imposing the same standard and will discuss them as one. Florida High School Activities Association v. Bradshaw, 369 So.2d 398 (Fla.2d DCA, 1978).
There is no question that Petitioners have constitutionally protected property rights in the value of their private brands. For example, Petitioner Coca Cola Company, through its Minute Maid Division, has expended millions of dollars in establishing the Minute Maid brand. Coca Cola regards the Minute Maid label as the second most valuable property owned by it, preceded only by the Coca Cola label itself. But property rights are not absolute; they are held subject to the state's police power and the constitutional guarantee of due process will not intercept the regular and lawful exercise of that power. Mayo v. Polk Co., 124 Fla. 534, 169 So. 41 (1936); appeal dismissed, 299 U.S. 507, 57 S.Ct. 39, 81 L.Ed. 376 (1936). The issue here is whether Rule 20-66.04 constitutes a valid exercise of the police power of the State of Florida.
A federal court has recently recognized that the police power doctrine under the Florida constitution is very similar to the doctrine of substantive due process under the Federal constitution. First, the exercise by a state of its inherent police power must be in the interest of achieving a public purpose, such as health, safety, morals, or general welfare of the public. Second, the specific form of police power chosen must be reasonably related to that public purpose. Patch Enterprises, Inc. v. McCall, 447 F. Supp. 1075 (M.D.Fla. 1978).
The parties here lock horns first on the issue whether the purpose of Rule 20-66.04 is legitimate; that is, whether it is a proper purpose for the exercise of the police power of the state. Petitioners argue that the purpose of the rule is to benefit the general economy of the Florida citrus industry and that this is not a proper subject for the exercise of the state's police power, citing Florida Citrus Commission v. HiAcres Concentrate, Inc., 227 So.2d 707 (Fla. 4th DCA 1969), cert. denied, 241 So.2d 859 (Fla. 1970). In that case the Fourth District Court of Appeal, in a brief opinion, considered the validity of a rule of Respondent requiring frozen concentrated citrus juice containers to have "easy open" tops. The *514 court observed that the purpose of the regulation was to improve the quality of containers used in the citrus industry, thereby selling more citrus juice and thus protecting and promoting the general economic welfare of the Florida citrus industry. The court held that economic benefit to the industry alone is not a valid basis on which the regulation could be justified. We disagree with that statement.
The regulation of the Florida citrus industry in the exercise of the state's police power has been upheld many times. E.g., Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915); L. Maxcy, Inc. v. Mayo, 103 Fla. 552, 139 So. 121 (1932); Mayo v. Polk Co., supra. In Sligh v. Kirkwood, supra, the United States Supreme Court observed that the police power, in its broadest sense, includes all legislation and almost every function of civil government. Most significantly, the court said "[the police power] embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health."
In that case the Court had under consideration a Florida statute making it unlawful for anyone to sell, offer for sale, ship, or deliver for shipment, any citrus fruits which were immature or otherwise unfit for consumption. The opponents of the statute contended that it was not a legitimate exercise of the police power because it had the effect of protecting the health of people in other states who might receive fruits from Florida in a condition unfit for consumption and, however commendable it may be to protect the health of such foreign peoples, that purpose is not within a state's police power. In upholding the statute, the Court said, in effect, that economic benefits are a legitimate purpose for the exercise of a state's police power:
We may take judicial notice of the fact that the raising of citrus fruits is one of the great industries of the State of Florida. It was competent for the legislature to find that it was essential for the success of that industry that its reputation be preserved in other states wherein such fruits find their most extensive market. The shipment of fruits so immature as to be unfit for consumption, and consequently injurious to the health of the purchaser, would not be otherwise than a serious injury to the local trade, and would certainly affect the successful conduct of such business within the state. The protection of the state's reputation in foreign markets, with the consequent beneficial effects upon a great home industry, may have been within the legislative intent, and it certainly could not be said that this legislation has no reasonable relation to the accomplishment of that purpose.
237 U.S. at 61, 35 S.Ct. at 503, 59 L.Ed. at 839.
Not long ago the United States Court of Appeals for the Fifth Circuit specifically held that economic benefit to a local industry is a permissible objective for the exercise of a state's police power. E.B. Elliott Adv. Co. v. Metropolitan Dade County, 425 F.2d 1141 (5th Cir.1970). In that case the court upheld a Dade County, Florida, ordinance prohibiting commercial advertising signs within 200' of any expressway right-of-way and providing for the regulation of such signs within 600' of the right-of-way. The court was of the opinion that various aesthetic considerations would justify such an ordinance, but it observed that the purpose was also to maintain and increase the attractiveness of the area to tourists, and thus influence the economic prosperity of the county. The court said "[t]here can be no doubt but that these objectives are constitutionally permissible under the police power of the State of Florida." It observed that the importance of the tourist industry to Dade County tended to make the ordinance reasonable in the economic sense because of the commercial benefits hoped to be realized from beautification.
In John Donnelly & Sons v. Mallar, 453 F. Supp. 1272 (D.Maine 1978), the court had under consideration a statute of the State of Maine which eliminated all off-premises outdoor billboard advertising in the state. *515 In upholding that statute, the court recognized that the act was intended to preserve the state scenic beauties not only for their aesthetic value but because a visual attractiveness of the state substantially promotes tourism, one of the state's major industries, as well as its general economic and cultural development. The court said "[t]he promotion of tourism manifestly is a valid legislative objective."
The Florida Supreme Court had an early opportunity to consider the value to the Florida citrus industry of advertising Florida citrus fruit. C.V. Floyd Fruit Co. v. Florida Citrus Commission, 128 Fla. 565, 175 So. 248 (1937). In that case the excise taxes levied by the three 1935 legislative enactments establishing the orange, grapefruit, and tangerine advertising funds were attacked on the ground that the purpose of the tax was not a public purpose. The court held that it was, saying "it cannot be reasonably contended that the protection and promotion of the citrus industry in Florida is not a matter of public concern or that the legislature may not determine within reasonable bounds what is necessary for the protection and expedient for the promotion of that industry. We are committed to the theory that advertising is a proper method for promoting the public welfare and that, therefore, the tax levied to provide funds for advertising serves a public end."
We have no difficulty in concluding that the advertising purpose of Rule 20-66.04, economic in nature, is a valid objective for the exercise of the police power of the State of Florida.
The next inquiry is whether the rule is reasonably related to the achievement of the legislative objective. In arguing that it is not, Petitioners cite State v. Leone, 118 So.2d 781 (Fla. 1960), for the proposition that if there is a choice of ways in which government can reasonably attain a valid goal necessary to the public interest, it must elect that course which will infringe the least on the rights of the individual. Petitioners argue that the legislative objective of advertising Florida citrus fruit can be accomplished simply by relying on the working of the free enterprise system. Petitioners say that it is axiomatic under the free enterprise system that each brand owner will choose, without outside compulsion, to adopt a marketing strategy which he concludes will more effectively increase his sales than other strategies; accordingly, each brand owner who concludes that sales of his brand will be so increased will place Florida identification on his brand label. Therefore, Petitioners argue, there is no necessity for the compulsion of Rule 20-66.04.
First of all, we observe that the choice of least infringement required under the principle enunciated in State v. Leone is a choice between or among possible regulatory devices. The principle was not meant to require a choice between regulation or nonregulation. Obviously, nonregulation will always be the choice that will infringe the least on the rights of the individual.
Secondly, although we share Petitioners' faith in the free enterprise system, we are not persuaded that the legislative purpose can be achieved by relying solely on laissez faire. Throughout their arguments to this court, Petitioners repeat over and over that their interests and that of Respondent are the same; that is, to sell more grapefruit products. That is not entirely true; Petitioners are interested in selling grapefruit products, including Florida grapefruit products, while Respondent is interested exclusively in selling Florida grapefruit products. Since 1935, the Florida legislature has determined that it is necessary for the state to supplement private brand advertising of its citrus fruit. It is for this reason that the legislature charged Respondent with the duty to conduct advertising of Florida citrus and imposed a tax to defray the cost.
There is a third consideration. While Petitioners invariably speak of the rule's labeling requirement and its interference with their private brand labels, it is important to note that the rule does not require that designation of Florida origin be placed on a label; it clearly permits such designation to be printed or embossed on the container *516 end. We think Petitioners' argument of unreasonable infringement fails in the face of this alternative means of designation permitted by the rule.
On the whole, we believe that the rule is reasonably related to a legitimate legislative purpose. Respondent has determined that in the face of increasing competition from other grapefruit-producing areas in the marketplace, identification of Florida products is necessary for Respondent's advertising to be effective. We cannot quarrel with that conclusion. It is true that Respondent has not cited, nor have we found, a single case from any jurisdiction addressing the question whether a mandatory declaration of state origin on a state product for solely economic purposes is a valid exercise of the state's police power. We feel confident in answering that question in the affirmative in this case.

THE COMMERCE CLAUSE
The third clause of Section 8, Article I, of the United States Constitution, provides that the congress shall have power "to regulate commerce ... among the several states ..." The United States Supreme Court has long held that, although congress has the exclusive power to regulate interstate commerce, there may be legitimate action by a state in the matter of local regulations, in the exercise of the state's police power, which the state may take until congress exercises its authority upon the subject. Sligh v. Kirkwood, supra. Therefore, state legislation designed to serve legitimate state interests and applied without discrimination against interstate commerce does not violate the commerce clause even though it affects commerce. What the states may not do is erect barriers to the free flow of interstate commerce. Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978).
In determining whether the impact of state regulation upon interstate commerce is permissible or impermissible, the Supreme Court has considered the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce. Raymond Motor Transportation, Inc. v. Rice, supra.
In the instant case, we have already held that Rule 20-66.04 is a valid exercise of the police power of the State of Florida. Therefore, the question here is whether the rule discriminates against interstate commerce or places a burden on interstate commerce which outweighs the legitimate state concern.
In support of their contention that the rule is invalid under the commerce clause, Petitioners have cited to us several cases in which the Supreme Court has found violations of the commerce clause, but all are clearly distinguishable from the instant case. We will mention two.
In Pike v. Bruce Church, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Court found invalid a provision of the Arizona Fruit and Vegetable Standardization Act which required that all cantaloupes grown in Arizona and offered for sale must be packed in certain specified standard containers approved by the official charged with enforcing the Arizona law. The law was challenged by a company which grew cantaloupes of exceptionally high quality in Arizona and then transported them to its facilities in Blythe, California, for packing and processing. The practical effect of the law would have been to compel the company to build packing facilities in Arizona, which would have been time-consuming and costly, and in the meantime, the company stood to lose a considerable amount of money invested in its current cantaloupe crop. The Court had no difficulty in finding that this was an unconstitutional burden on interstate commerce. In doing so, it observed that Arizona's interest was in requiring that interstate cataloupe purchasers be informed that the company's high quality fruit was grown in Arizona, and the court said that this asserted state interest was a legitimate one. But the court said that the commerce clause cannot permit a state to require a person to go into a local packing business solely for the sake of enhancing *517 the reputation of other producers within its borders.
The second case cited by Petitioners is Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). That case involved a statute enacted by the State of North Carolina which required that all closed containers of apples sold, offered for sale, or shipped into the state bear no grade other than the applicable U.S. grade or standard. The law was challenged by the Washington State Apple Advertising Commission on the ground that the effect of the law was to prohibit the display of Washington State apples grades brought into North Carolina. Washington law required all apples shipped in interstate commerce to be tested under strict quality standards and graded accordingly. The court noted that the Washington State grades, which had gained substantial acceptance in the trade, were the equivalent of, or superior to, the comparable U.S. grades and standards. The question was whether the North Carolina law violated the commerce clause insofar as it prohibited the display of Washington State grades on closed containers of apples shipped into the state from Washington. Finding a violation, the Court said that the challenged statute had the practical effect of not only burdening interstate sales of Washington apples, but also of discriminating against them.
Rule 20-66.04 will have no effect on interstate commerce of the kind found in the Bruce Church and Washington Apple cases. Petitioners have not suggested to us that their importation of out-of-state grapefruit into the State of Florida will be altered in any way by reason of the rule's application (restricted as stated at the beginning of this opinion). They have not suggested that they will be required to invest in new plant facilities or alter existing ones, or indeed that their operations will be changed in any manner whatsoever. Although Petitioners assert that the rule discriminates against and places an unconstitutional burden on interstate commerce, they have failed to articulate just what that discrimination or burden is. This court sees no effect of the rule on the importation of grapefruit into this state, or the export of grapefruit products from this state, nor are we persuaded that the rule is intended to have any such effect.
Therefore, we hold that Rule 20-66.04 is not invalid by reason of the commerce clause of the United States Constitution.

FREEDOM OF SPEECH
Freedom of speech is guaranteed by the 1st Amendment to the United States Constitution and in Article I, Section 4, of the Florida Constitution. The 1st Amendment to the United States Constitution applies to the states under the 14th. Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). We have first considered whether the guarantee contained in the Florida constitution is any broader than that contained in the United States Constitution. We have found no case in Florida answering that question. We agree with the observation that Florida courts tend to merge the two limitations to the point that federal and state cases are cited interchangeably.[6] Under the circumstances, and in the absence of any expression by our supreme court that the Florida guarantee is broader in scope than the federal, we conclude that the two are the same and will not treat them separately.
Petitioners first propose that commercial and promotional speech is constitutionally protected under the freedom of speech guarantee. Respondent does not dispute that, nor do we. The United States Supreme Court so held in Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). The Court expressly rejected the notion, previously held in some quarters, that expression concerning purely commercial transactions is wholly outside the protection of the 1st Amendment.
*518 Petitioners argue that their commercial speech  that is, the promotional statements on their labels  is infringed by Rule 20-66.04 in two respects. First, Petitioners say that their labels will be demeaned because Respondent's advertising will cause consumers to conclude that all grapefruit from Florida is of substantially equal quality, so that Petitioners' brands of products of higher quality will be reduced to the level of the brand of lowest quality in the marketplace. Petitioners say that a significant portion of grapefruit products on which the declaration of origin will appear is of substantially lower quality than theirs.
Secondly, Petitioners claim that the rule will impose a message on their advertising which they do not wish to convey, in that consumers may be reminded of images associated with Florida or with Respondent's advertising that are "ideologically sensitive." Petitioners say that Respondent is forcing Petitioners' private property to become an expression of points of view made by or associated with Respondent's advertising, a function Petitioners do not want to perform and which they believe will be harmful to the extensive efforts of each to distinguish and promote its own brand of grapefruit products. Petitioners, however, have cited to us no example in the record of an unfavorable image associated with Respondent's advertising or with the State of Florida.
Again we note that the rule does not require that designation of Florida origin appear on Petitioners' labels. Alternatively, it may appear on the container end. As far as Petitioners' labels are concerned, we are not persuaded that the association of Petitioners' brand names with grapefruit products inferior to theirs will be made significantly greater by the description of Petitioners' products as "Florida grapefruit" rather than merely as "grapefruit." It seems to us that Petitioners' argument in this respect relates to a matter of competition; whereas, Petitioners' brand names now compete with other brand names in the marketplace on the basis that all offer "grapefruit" products to the consumer for selection, the rule will require that competition be based on an offering of "Florida grapefruit" products. It seems to us that Petitioners can compete as well for the Florida grapefruit products market as they have competed in the past for the grapefruit products market. Florida law provides minimum quality standards for food products of citrus fruits. § 601.11, Florida Statutes (1977); Florida Administrative Code, Chapter 20-64.
The more serious point, we believe, is that Petitioners will be compelled to carry the images associated with Respondent's advertising campaign, good or bad. In this sense there is no question but that the rule relates to the content of Petitioners' commercial message. In arguing that the guarantee of freedom of speech is violated by the rule's compulsion, Petitioners have cited to us Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In that case the United States Supreme Court upheld a challenge by followers of the Jehovah's Witnesses' faith to a New Hampshire statute requiring automobiles to carry license plates embossed with the state motto "Live free or die." The court said that "[t]he New Hampshire statute in effect requires that appellees use their private property as a mobile billboard for the state's ideological message  or suffer a penalty." In this case Petitioners argue that in the very same manner, Respondent is forcing Petitioners' private property to become "mobile billboards" for points of view made by or associated with Respondent's advertising. Petitioners argue that, under the authority of Wooley v. Maynard, this court should find an infringement of Petitioners' freedom of commercial speech.
But Wooley v. Maynard dealt with an infringement of personal-noncommercial speech. The protection afforded commercial speech under the 1st Amendment is not commensurate with that afforded personal speech. The Supreme Court recently pointed out that it has not discarded the distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, *519 and other varieties of speech. The Court said that commercial speech is afforded a limited measure of protection, commensurate with its subordinate position in the scale of 1st Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression. Ohralik v. Ohio State Bar Association, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).
The content of commercial speech is indeed regulated extensively in this country, both in terms of matters prohibited and in terms of information required to be shown. For example, Section 500.11, Florida Statutes (1977), requires specific information on labels of all food products. The Florida Citrus Code directs Respondent to prescribe rules and regulations governing labeling for the purpose of showing specified information. The validity of regulations pertaining to the content of commercial speech has been traditionally tested on due process and commerce clause grounds, not on 1st Amendment guarantees of freedom of speech.
Unlike the case of personal speech, it is not necessary to show a compelling state interest in order to justify infringement of commercial speech through regulation. It is true, as Petitioners point out, that the court in Anderson, Clayton & Co. v. Washington State Department of Agriculture, 402 F. Supp. 1253 (W.D.Wash. 1975) spoke of the necessity of showing a compelling state interest in this area. We believe the court in that case was under the erroneous impression that the Supreme Court had placed commercial speech in the same category as noncommercial speech for 1st Amendment purposes, an intention which the Court later disavowed in Ohralik v. Ohio State Bar Association, supra.
Reverting to the language of the Supreme Court's opinion in Bigelow v. Virginia, supra, we believe the Court has simply said that there is a 1st Amendment interest at stake in commercial speech and that interest must be weighed against the public interest allegedly served by the regulation.[7] Accordingly, we have engaged in the task of balancing the interests at stake in this case and have concluded that Petitioners' 1st Amendment interests are not so great as to outweigh the public's interest sought to be served by Respondent's Rule 20-66.04. Accordingly, we hold that the rule does not violate the federal and Florida guarantees of freedom of speech.

OTHER POINTS
Petitioners have raised two other points that we will treat briefly. The first of these is that there is not competent substantial evidence in the record to support Respondent's decision to adopt Rule 20-66.04. Petitioners' argument in this respect amounts to an attack on the wisdom of the rule. They argue that there is no proof that the rule will accomplish the legislative objective. Further, they point to testimony of their advertising expert that designation of Florida origin on grapefruit products is undesirable and may have an adverse effect on sales.
But, obviously, there can be no guarantee of results in any decision on a matter of advertising. An exercise of police power will not be struck down because a law or regulation is unwise, improper, or out of harmony with a particular school of thought. Williamson v. Lee Optical of Okl., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). We feel that the evidence in the record as to the anticipated increase in competition from non-Florida grapefruit is sufficient to justify Respondent's decision to require that Florida grapefruit products be identified in the marketplace. The wisdom of that decision is not a matter of judicial concern.
Finally, Petitioners argue that Respondent failed to comply with Florida's Administrative Procedure Act (Chapter 120) in two respects. They point to Section *520 120.54(2), Florida Statutes (1977), which requires that all state agencies prepare an economic impact statement prior to the adoption of any new rule. As Respondent points out, however, its notice of proposed rulemaking was published in 1975 and the law then in effect required no economic impact statement. It was not until 1976, after all testimony had been taken by Respondent in public hearings on the proposed rule, that the legislature enacted the law requiring a statement of economic impact. Respondent also points out that this issue was not raised by Petitioners during Respondent's rulemaking proceedings. We decline to hold the rule invalid because of Respondent's failure to prepare the economic impact statement required by Section 120.54(2).
The other alleged violation urged by Petitioners is that Respondent failed to rule on Petitioners' proposed findings of facts. Petitioners argue that Respondent was required to do this by Section 120.59(2). But that section applies to "orders" and Section 120.52(9) defines an order as a final agency decision which does not have the effect of a rule. Respondent argues, and we agree, that Section 120.59 does not apply to rulemaking.

CONCLUSION
This court finds no ground in this case for setting aside, modifying, remanding, or ordering agency action or ancillary relief. Accordingly, we are required to, and we do, affirm the action of Respondent in adopting Rule 20-66.04. Section 120.68(14), Florida Statutes (1977).
Affirmed.
HOBSON, Acting C.J., and BOARDMAN, J., concur.
NOTES
[1] § 601.98, Fla. Stat. (1977).
[2] The statutory definition of "citrus fruit" includes processed citrus products containing 20 percent or more citrus fruit or citrus fruit juice. § 601.03(7), Fla. Stat. (Supp. 1978).
[3] "Handler" is defined as any person engaged within Florida in the business of distributing citrus fruit in the primary channel of trade or any person engaged as a processor in the business of processing citrus fruit. § 601.03(23), Fla. Stat. (1977). The excise taxes imposed under Chapter 601 are payable at the time citrus fruit is first handled in the primary channel of trade. §§ 601.156 and 601.157, Fla. Stat. (1977); §§ 601.15(6)(a), 601.154, 601.155, and 601.158, Fla. Stat. (Supp. 1978).
[4] Excise taxes imposed under other sections of Chapter 601 are paid into the trust fund and earmarked for special purposes. E.g., § 601.152, Fla. Stat. (Supp. 1978).
[5] § 601.15(7)(f), Fla. Stat. (Supp. 1978). Under certain circumstances, up to 10% of the advertising fund may be expended for noncommodity advertising, merchandising, publicity, and sales promotion, including brand advertising rebate programs.
[6] Alloway and Knight, Trends in Florida Constitutional Law, 16 U.Miami L.Rev. 685, 698 (1961).
[7] The balancing test of the Bigelow case is discussed in a comment on that case at 28 U.Fla.L.Rev. 610 (1976).